## PHILLIPS v. UNITED STATES.

(District Court, W. D. Pennsylvania. January 8, 1926.)

No. 3319.

1. Internal revenue ⊜⇒7—Dividends declared in 1916 and January 1917, and paid in 1917, held taxable as income of the distributee of 1917 at the 1916 rate (Revenue Act 1916, § 31 [b], as added by Revenue Act 1917, § 1211 [Comp. St. 1918, § 6336z (b)]); "distribution."

Under the provisions of Revenue Act 1916, § 31(b) as added by Revenue Act 1917, § 1211 (Comp. St. 1918, § 6336z[b]), that any distribution made to stockholders in 1917 or subsequent tax years "shall be deemed to have been made from the most recently accumulated undivided profits or surplus * * * and shall be taxed to the distributee at the rate prescribed by law for the years in which such profits were accumulated by the corporation," the "distribution" takes place when a dividend is declared from the existing profits or surplus and dividends declared in 1916 and in January, 1917, up to which time no profits had been earned in 1917, which dividends were paid in 1917, must be deemed to have been paid from profits earned in 1916, which were sufficient, and are taxable as income of the distributee in 1917, at the 1916 rate.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Distribution.]

2. Internal revenue ⊜⇒7—All pertinent facts and circumstances are to be considered in determining the "fair market price or value" of corporate stock on March 1, 1913, as a basis for computing taxable profits from its sale (Revenue Act 1916, § 2, as amended by Revenue Act 1917, § 1200 [Comp. St. 1918, § 6336b(c)]).

Under Revenue Act 1916, § 2, as amended by Revenue Act 1917, § 1200 (Comp. St. 1918, § 6336b[c]), in determining the "fair market price or value" of stock of a corporation on March 1, 1913, as basis for computation of the taxable profit made by a stockholder on a subsequent sale, the price paid in sales on a stock exchange on that date is not conclusive, but is to be considered in connection with other sales from time to time, the fair market value of

the corporation's assets, and any other facts which may have a legitimate bearing.

### 3. Words and Phrases—"Fair market value."

"Fair market value" is the value of property in money as between one wishing to purchase and one wishing to sell; the price at which seller is willing to sell at fair price, and buyer willing to buy at fair price, both having reasonable knowledge of facts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Fair Market Value.]

At Law. Action by B. D. Phillips against United States, tried to the court. Judgment for plaintiff.

James Walton, of Pittsburgh, Pa., for plaintiff.

John D. Meyer, U. S. Atty., and W. J. Aiken, Asst. U. S. Atty., both of Pittsburgh, Pa.

THOMSON, District Judge. This action is brought under the Revenue Act of October 3, 1917 (40 Stat. 302), for the recovery of income tax alleged to have been unlawfully assessed and collected by C. G. Lewellyn, former collector of internal revenue for the Twenty-Third district of Pennsylvania. The collector's term of office having expired when the suit was instituted, the court's jurisdiction is based on paragraph 20 (a), § 24, of the Judicial Code as amended February 24, 1925 (Comp. St. Supp. 1925, § 991), whereby jurisdiction is conferred on District Courts of the United States concurrently with the United States Court of Claims.

For the year 1917, in addition to the taxes returned and paid by the plaintiff, the collector, in 1920, assessed an additional tax for 1917, of $23,452.85, which, under protest, the plaintiff was compelled to pay. This assessment was based on the claim: First, that all the dividends reported were taxable at the 1917 rate, instead of the 1916 rate, under which all dividends were reported except a small amount reported under the 1915 rate; and, second, additional profits on the sale of 9,200 shares of the common stock of the Pure Oil Company, the fair value of which, on March 1, 1913, being alleged to be $15.25 per share, instead of $22.50, as returned by the plaintiff. A claim for abatement, having been duly filed, was rejected.

[1] The issue with respect to dividends is one of law; that is, whether the distribution should be considered as made when the dividend is declared, as contended by the plaintiff, or as of the date when the dividend is paid, as contended by the government. The second question as to the fair value of the stock of the Pure Oil Company, as of March 1, 1913, is purely a question of fact.

The statute involved on the question of dividends is from the Revenue Act of 1916, as amended October 31, 1917, which is as follows:

"Sec. 31 (a) That the term 'dividends,' as used in this title shall be held to mean any distribution made or ordered to be made by a corporation * * * out of its earnings or profits accrued since March first, nineteen hundred and thirteen, and payable to its shareholders. * * *

"(b) Any distribution made to the shareholders or members of a corporation * * * in the year nineteen hundred and seventeen, or subsequent tax years, shall be deemed to have been made from the most recently accumulated undivided profits or surplus, and shall constitute a part of the annual income of the distributee, for the year in which received, and shall be taxed to the distributee at the rates prescribed by law for the years in which such profits or surplus were accumulated by the corporation. * * * *" Added by Act Oct. 31, 1917, § 1211 (Comp. St. 1918, § 6336z).

It is necessary to know precisely what the facts are, in relation to the dividends, in order that the statute may be properly applied. It is not controverted that twenty of the dividends in question were declared in November and December, 1916, and nine were declared in the month of January, 1917. Of the twenty declared in November and December, 1916, nine were paid in January, six in February, two in March, one in June, one in September, and one in December, 1917. Of the seven declared in January, 1917, three were paid in February and four in March, 1917. It is conceded of record that there were no January earnings at the date when the several dividends were declared in January, 1917. (See testimony of Bishop, pages 185 and 189 of record, and stipulation, page 204); it being the admitted practice of the department to regard the dates of payment as decisive, and not the date of declaration. In this situation, what is the applicable legal rule? The case of Mason v. Routzahn (D. C.) 8 F.(2d) 56, decided by Judge Westenhaver of the Northern District of Ohio, is exactly in point. In that case the corporation declared two dividends in October, 1916, one payable in January, and the other in February, 1917. In January, 1917, it declared two dividends, one payable in May, and the other payable partly in May and partly in July, 1917. The court

there held that the applicable rate of taxation was that which obtained in 1916, because a distribution by the corporation to stockholders takes place when the declaration of the dividend is made and not when the dividend is paid. The court cited U. S. v. Guinzburg (C. C. A.) 278 F. 363, and Plant v. Walsh ( D. C.) 280 F. 722. At the time of the decision in the Mason-Routzahn Case, the Case of Edwards v. Douglas (46 S. Ct. 85, 70 L. Ed. —) was pending in the Supreme Court, but had not been decided. In Edwards v. Douglas the contention of the defendant that the two dividends, called "depletion dividends," were not taxable because not constituting income, was overruled, both by the District Court (287 F. 919) and the Circuit Court of Appeals (298 F. 229), and that position was not urged in the Supreme Court. The District Court held that the dividends in question were income and taxable at the 1917 rate. This was reversed by the Circuit Court of Appeals; that court holding that there was on hand on December 31, 1916, in the surplus account a balance of profits sufficient to enable the corporation to pay the dividends from such surplus, and therefore that the dividends should have been taxed under section 31 (b) at the 1916 rate. This judgment of the Circuit Court of Appeals was reversed by the Supreme Court (46 S. Ct. 85), in an opinion by Justice Brandeis, filed on November 23, 1925; the court holding that there were profits of the year 1917 ample to cover all dividends, and that those in suit must be deemed to have been paid therefrom, and as such were taxable under the 1917 rate.

A careful examination of this case must be made in order to ascertain how far it is controlling in the present action. The sole question considered by the Supreme Court was whether the dividends paid in September and December, 1917, should be deemed to have been paid out of the earnings of that year, or out of an accumulated surplus built up in 1916 and earlier years. The corporation paid from time to time, in the year 1917, ten dividends, involving $14,-000,000, after the payment of which there remained a large excess to be added to surplus at the end of the year. After the payment of the previous dividends, there was no claim that there were insufficient undistributed earnings of 1917 to pay the two dividends in question, or that the corporation did not have this knowledge at the time the dividends were declared and paid. As sec-

tion 31 (b) provides that dividends shall be deemed to have been paid "from the most recently accumulated undivided profits or surplus," the Supreme Court draws the distinction between "surplus" and "undivided profits"—"surplus" representing the net assets of a corporation in excess of all liabilities including its capital stock, and that this word, as used in section 31 (b) means that part of the surplus which was derived from profits which, at the close of earlier accounting periods, were carried into the surplus account as undistributed profits; that, on the other hand, the term "undivided profits" has not acquired a like fixed meaning in corporate finance and accounting; that "undistributed profits" is generally employed to describe profits which have neither been distributed as dividends, nor carried to surplus account, upon the closing of the books (that is, current undistributed earnings). The court held that this is the meaning of the term as used in section 31 (b). The court then said, referring to the act:

"Its general aim was clearly to make the dividend, in whatever year paid, bear the tax rate of the year in which the profits of which it was a distribution had been earned, and for this purpose to treat as a unit the profits of the whole tax year. In providing measures for the attainment of that aim, it could be of no practical significance whether, at the time of the payment of the dividend, these profits appeared in a surplus or undivided profits account (as the profits earned within part of a year would, where a corporation closed its books monthly, quarterly, or semiannually) or whether they still rested as current earnings without formal determination or specific allocation."

The court also held that, in determining the applicable tax rate, it was essential that the law should not only disregard any declaration of the corporation as to what year's profits were being distributed, but also that the dividend should not thereupon be deemed to have been paid from the profits of the earliest year since March 1, 1913, of which there remained accumulated profits available for distribution; and that, to effect the object of Congress, it was necessary that the dividend be deemed to have been paid out of the available profits or earnings of the most recent year or years. The court said that this intention is adequately expressed by the phrase "most recently accumulated," in connection with the words "undivided profits or surplus." The court concluded that, as there were profits of the year 1917

ample to cover all dividends, those in suit must be deemed to have been paid therefrom under the 1917 rate.

There was no question before the Supreme Court as to the effect, if any, on the question of taxable rate, if the dividends were declared at one time and payment made at a latter time. We must assume in that case that the declaration and payment were practically contemporaneous. At the time the dividends were declared and paid, there were accumulated profits of 1917 available for distribution, and from these "most recently accumulated undivided profits" they must be deemed—that is, conclusively presumed—to have been paid.

In the case before us, the dividends which were declared in 1916, and paid in 1917, must necessarily have been paid from "undivided profits or surplus," accumulated not later than 1916, which year furnished the applicable tax rate. As to the remaining dividends, as it is conceded that there were no profits earned in January, 1917, and the dividends were declared in said month, they must be deemed to have been paid from the profits or surplus of 1916. This conclusively follows from the wording of the statute. The dividends are deemed to have been paid from the most recently accumulated undivided profits or surplus; they constituted a part of the annual income of the distributee for the year in which received; and are taxed to the distributee at the rate prescribed for the year in which such profits or surplus were accumulated, thus complying completely with the provisions of the statute. The conclusion is also in harmony with the opinion of the Supreme Court in the Edwards v. Douglas Case, wherein, referring to the act, the court said:

"Its general aim was clearly to make the dividend, in whatever year paid, bear the tax rate of the year in which the profits of which it was a distribution had been earned."

The plaintiff's contention must therefore be sustained as to the tax rate on all dividends except those declared subsequent to January, 1917. As to the latter, the plaintiff abandoned the same as an issue on the trial of the case.

[2, 3] The second question involves the fair market price or value of the Pure Oil Company stock as of March 1, 1913. Plaintiff sold his stock on July 26, 1917, for $24.50 per share and in the return of income for that year reported a gain of $2 per share based upon the value of $22.50 per share as of March 1, 1913. The Commissioner of Internal Revenue determined such value at that

date to be $15.25 per share, and the taxable gain derived by the plaintiff from the same in 1917 as $7.25 per share in excess of that reported by the plaintiff. The field revenue agent, appointed by the Commissioner to examine and determine plaintiff's tax liability, determined the value of the stock on March 1, 1913, solely on the price paid on that date, on the Pittsburgh Stock Exchange, and the Commissioner adopted his findings on the basis of value. The law of the case seems perfectly plain. It is well settled that the fair market price or value of the property as of March 1, 1913, is a question of fact under all the circumstances of the case. No method of determining this value can be stated which will adequately meet all circumstances. The stock sales made from time to time are to be considered together with the nature and extent of the sales, and the circumstances under which they were made; hence forced sales, or sales of small lots, may often be no real indication of the value. The test is the fair market value. This may be defined to be the value of the property in money as between one who wishes to purchase and one who wishes to sell; the price at which a seller willing to sell at a fair price, and a buyer willing to buy at a fair price, both having reasonable knowledge of the facts. Prior to 1924, it appearing that the Treasury Department, in valuing the stock of close corporations, had given insufficient weight to the value of the assets and too great weight to forced or isolated sales of comparatively small blocks, there was inserted in the Revenue Act of 1924, 43 Stat. 259 (Comp. St. Supp. 1925, § 6336⅛bbb), these words:

"In determining the fair market value of stock in a corporation as of March 1, 1913, due regard shall be given to the fair market value of the assets of the corporation as of that date."

The case of Walter v. Duffy, 287 F. 41, opinion by the Circuit Court of Appeals for the Third Circuit, is controlling on the legal phase of this question. The court said:

"The words 'fair market price,' certainly meant that not only must the market price be ascertained by sales, but that sales so made, the circumstances under which they were made, the subject-matter of the sales, all the attendant circumstances, were to be considered to determine whether such sales served to evidence, not alone a market sale, but the fair price which Congress said should be the statutory start or base from which subsequent 'gain derived' should be determined."

The court reversed the judgment of the

court below, as that court had held that, because sales of stock had been made, this fact, without regard to the circumstances under which they were made, established the statutory "fair market price" of the stock.

Under all the circumstances, it is clear to the court that the sales on the Pittsburgh Stock Exchange are an inadequate gauge of the fair market value of the stock, failing to properly reflect the fair market value of the assets of the corporation. This conclusion is based on the following considerations: The evidence shows that the independent oil operators of Western Pennsylvania had for a long time suffered from monopolistic domination, which interfered and restricted every means of disposing of their oil as they desired. As a defensive measure, in 1895, the Pure Oil Company was organized, the object of the incorporators being to ·perfect an organization of such character that the controlling interest would be irrevocably removed from the hands of their opponents, except upon the consent and agreement of all the parties. It was recognized that a man going into the company might later sell his stock, or might die, and his stock would be sold by his estate. To prevent a possible loss of control, the incorporators decided to organize under a trust agreement. The preamble of the trust agreement set forth in substance that it was advisable, essential, and ·intended for the safety and advantage of all interests, that the control of the company shall be so secured for the period of twenty years from the date (1895) as to render impossible the diversion of its resources and business from the intended use and course, in opposition to monopoly in business and to permanently protect and maintain what . are known as "the independent interests in the petroleum industry."

Under this agreement, the legal control of something more than 50 per cent. of the common stock originally issued and subsequently issued was vested in a board of fifteen trustees, and this legal control and title was provided to be effective, regardless of actual or equitable ownership. Thomas W.. Phillips, the father of the plaintiff, was an incorporator and one of the original trustees. The trust agreement could not be changed at any time except with the consent in writing of- the Pure Oil Company, three-fifths of the persons at the time acting as trustees, and of the equitable owners of three-fifths of the shares so held in trust. By conserving their resources, the company materially added to its properties, extending them beyond the confines of Pennsylvania

throughout a number of other states in the oil-producing sections. They established distributing depots throughout the country. They organized or controlled seven subsidiary companies on March 1, 1913, viz.: Pure Oil Operating & Producing Company, Northwestern Oil & Gas Company, United States Pipe Line Company, Quaker Oil & Gas Company, Producers' & Refiners' Company, Pure Oil Pipe Line Company, Pure Oil Steamship Company.

The evidence shows that the various properties of the Pure Oil Company, by reason of their geographical position, had a strategic value; that the improvements of the company were gradual, consistent, and uniform; that the parent company with its subsidiaries constituted a composite unite, possessing every facility from the production of crude oil all the way through its refinement and manufacture into finished product, its transportation and distribution to the ultimate consumer at retail. It also established and enjoyed a profitable export business to foreign countries, maintaining its own line of tank steamers.

With very few exceptions, all of the stockholders from the beginning had no purpose to sell the control of the company until about 1912. The large majority of the stockholders held their stock from the beginning to the time of the final sale on June 26, 1917. The plaintiff was one of this number. The plaintiff, with his brothers and sisters, held the stock which had been devised to them by their father, and were not interested in any alleged market or stock exchange quotations, having the purpose only of maintaining their independence in the oil industry. Mr. E. H. Jennings, who was not specially interested in the purpose of the Pure Oil Company, as viewed by the independent producers and refiners, acquired, from time to time, considerable stock. He and his associates dealt in the ·stock on the Pittsburgh Stock Exchange to such extent as was possible with the very limited number of shares available for purchase by the general public.

In 1911, the company sold its European stations in Hamburg and Rotterdam, obtaining with the sale a contract for the term of ten years, by which the company could obtain from the South Penn Oil Company, at the common market price, 2,000 barrels daily of Pennsylvania crude, or a like amount of Illinois crude, if that grade was desired. This, with the crude gathered from its own connections, gave. the company about 8,000 barrels of crude oil production. The company was refining crude oil, and in addition

was delivering crude to seven or eight other refineries. This contract was of very great value, as the company could take the oil or not take it as it chose. When times were good and it was profitable to refine crude oil, they had the call for 2,000 barrels daily. If times were bad they could decline to take it. The value of this contract, together with the good will, the strategic value, and perhaps other intangibles, were in no manner reflected on the books. The book values, upon which considerable stress has been laid, represent the cost of the properties of the corporation, less depreciation and depletion.

It was clearly established that on July 16, 1914, parties of unquestioned financial ability made an offer of $22.50 per share for the controlling interest in the stock. The parties met in the bankers' office in New York on July 29th for the purpose of closing the deal, and were on the point of passing $100,000 earnest money, when word of the breaking out of the World War and the closing of the New York Stock Exchange came over the telephone. This immediately terminated the negotiations. On that date the quotation on the Pittsburgh Stock Exchange was 18⅝.

It is established that some time between the fall of 1913 and the spring of 1914, at a meeting of the stockholders representing a controlling interest, and called for the purpose of determining at what price the majority of the stockholders were willing to sell, each shareholder separately placed on a piece of paper the price he was willing to take, and the average price thus ascertained was a little in excess of $26 per share. Afterwards, on June 26, 1917, the large shareholders constituting the controlling interest, of which the plaintiff holding 9,200 shares was one, sold their stock for $24 per share. On March 1, 1913, the Pure Oil Company had 907,049 shares of stock outstanding. For the six months' period from February 1, 1913, to July 31, 1913, the percentage of average monthly sales on the Pittsburgh Stock Exchange to the total shares outstanding was 1.17 per cent.

From the foregoing facts the court finds that neither the bid price of the stock on March 1, 1913, nor the average selling price on the stock exchange during the whole period from that date to the date of sale, represents in any true sense the fair market value of the stock. The value of the plaintiff's property should be measured on the basis of that which he sold, viz. a part of the controlling interest in the corporation. On March 1, 1913, because of the existence of the trust agreement, it was not possible to purchase such a limited number of shares as at any time were offered. This fact alone, during the existence of the agreement, made the selling price on the stock exchange of little weight as a gauge of actual value.

It clearly appears that the oil business was temporarily depressed in 1914. On March 1, 1913, Pennsylvania crude sold for $2.50 a barrel, as compared with $1.70 per barrel in July, 1914, while the company's earnings in 1914 were $1,041,000 less than in 1913. Yet, notwithstanding this fact, the legitimate offer of $22.50 per share was made on July 16, 1914.

We have in addition the testimony of a number of witnesses, of character, long experience in the oil business, and intimate knowledge of the property and assets of the Pure Oil Company, that the fair value of the stock on March 1, 1913, was $22.50 per share, and that there was no substantial change in the company's financial position between that date and July 16, 1914, the date of the Porter-Breitung Company offer.

After giving due consideration to the sale and prices bid on the stock exchange, restricted as they were by the facts above detailed, and taking into consideration the company's property, its book values, earnings, dividends, business prospects, good will, and strategic value, together with the evidence of those most familiar with the property, and most competent to estimate its value, I find as a fact that the fair market value of the plaintiff's stock on March 1, 1913, was $22.50 per share, making the taxable gain by reason of the sale $2 per share.

Judgment will therefore be entered for the plaintiff for the amounts thus found to be due as set forth in this opinion, with interest from the dates when the same were paid.