**BUCK et al. v. COMMISSIONER OF INTERNAL REVENUE. ***

No. 8061.

Circuit Court of Appeals, Ninth Circuit.

May 4, 1936.

*Rehearing denied June 8, 1936.

Norman A. Eisner, of San Francisco, Cal., for petitioners.

Robert H. Jackson, Asst. Atty. Gen., Sewall Key, John M. Hudson, and Edward F. McMahon, Sp. Assts. to the Atty. Gen., and E. W. Pavenstedt, of Washington, D. C., for respondent.

Before WILBUR, MATHEWS, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

Petitioners have asked review of an adverse decision of the Board of Tax Appeals assessing deficiencies disclosed by an examination of their income tax returns for the year 1929. The petitioners filed separate petitions before the Board, but the proceedings were consolidated.

From the Board's opinion it appears that on or about January 31, 1929, petitioners each owned approximately one-third of the outstanding stock of the Industrial Solvents Corporation of California; each owned stock of the Mason By-Products Company; each owned an interest in a promissory note for $388,087.50 owing by the last-named company which was secured by a deed of trust on all that company's property, and which was payable to the estate of John A. Buck, Sr. Petitioners' interests in the note was bequeathed to them by the will of John A. Buck, Sr.; two of the petitioners each thereby acquiring a one-eighth interest in the note and the other petitioner thus acquiring a one-half interest in said note. The value of the note for estate tax purposes was placed at $45,389.70.

On January 31, 1929, petitioners entered into an agreement with W. S. Kies & Co.,

designated as the banker, and American Commercial Alcohol Corporation of Maryland, designated as the buyer. Under this agreement petitioners agreed to sell all the outstanding capital stock of Industrial Solvents Corporation of California, and cause all the assets of the latter corporation, except accounts receivable, to be transferred to the buyer, together with the secured note above mentioned. Petitioners were to receive cash equivalent to the value of current net assets, excluding accounts receivable, of the Industrial Solvents Corporation of California, and either 4,800 shares of 7 per cent. cumulative preferred stock of the buyer, or, at the option of the petitioners, 8,000 shares of common stock of the buyer. The option required election within six months, and was to be evidenced by a due bill. It is unnecessary to relate other details of the agreement.

Of the property to be received by petitioners, they allocated 1,250 shares of the common stock of the buyer as payment for the secured note, above mentioned, and about a month later, when the contract was consummated, the banker agreed to purchase the 1,250 shares so allocated at a price of $77 per share, as part consideration of the performance of the agreement, and the banker did purchase such shares about April 15, 1929. Petitioners elected to receive common stock of the buyer in June, 1929, and shortly thereafter petitioners received voting trust certificates for the common stock. These certificates were issued pursuant to the terms of the agreement, and represented 8,000 shares of common stock of the buyer, less the 1,250 shares sold to the banker, plus a stock dividend.

Petitioners did not include as income the value of the buyer's stock so received in their returns for the year 1929. Respondent assessed deficiencies on the returns by computing the value of the stock at $86.50 per share. His conclusion was based on stock market quotations, stating that "the last sale on March 1, [1929] was 5,500 shares at $86.75." The Board found that the fair market value of the shares was $77 per share, saying that "the sale of 1,250 shares at $77 per share, cash, at sometime between February 28, 1929 and April 15, 1929, is the best evidence of record of the fair market value of the shares received by the" petitioners.

Revenue Act of 1928, c. 852, § 111 (c), 45 Stat. 815, 26 U.S.C.A. § 111 (b) and note, provides: "The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received."

We are not concerned with the cost of the property sold, for the purpose of computing the capital gain, but, as both parties concede, the sole inquiry is whether or not there is any substantial evidence to support the finding by the Board of the fair market value of the stock received by petitioners at the time of the performance of the agreement.

Only one witness appeared before the Board. Other than the evidence of the isolated sale to the banker of the 1,250 shares, there was practically no evidence as to the fair market value of the stock. The witness, who was one of the petitioners, testified:

"* * * I familiarized myself with the stock structure of the company and the amount of stock outstanding. There were quotations upon the stock but the quotations meant nothing. There was no stock really out that could be sold. There were quotations at that time but I don't believe anyone could sell 1250 shares. * * *

"Q. Now, Mr. Buck, what, in your opinion, was the value of a share of common stock of [buyer] on February 28, 1929? A. I gave my opinion before from our calculations that it was worth about $20.00 a share. * * *

"Q. Do you know whether or not there were any substantial quantities of stock traded in on the exchange at the price quoted? A. I know there were not."

On cross-examination, however, he admitted that some sales were reported about February 28, 1929, but that he did not know whether there were sales or not, that he did not know whether there was a sale of over 5,000 shares of the stock at $86.75 a share on or about March 1, 1929, and that he had never been a stock trader, and did not "claim any great experience in that field."

Petitioners argue that particular sales are not competent evidence of value. They also argue that "the facts and circumstances surrounding this particular sale clearly indicate that it could not possibly be evidence of fair market value," and

rely on Walter v. Duffy (C.C.A.3) 287 F. 41; Heiner v. Crosby (C.C.A.3) 24 F.(2d) 191; Strong v. Rogers (C.C.A.3) 72 F.(2d) 455; Phillips v. U. S. (D.C.Pa.) 12 F.(2d) 598. Petitioners suggest that either the valuation fixed by the witness who testified should be accepted by us or the cause remanded to the Board of Tax Appeals for determination as to value.

 The determination of the Commissioner was presumptively correct, and the burden of proof is on petitioners to overcome the presumption. Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212; Old Mission Co. v. Helvering, 293 U.S. 289, 294, 55. S.Ct. 158, 79 L.Ed. 367. Therefore, assuming, without deciding these questions as contended by petitioners, that the evidence of the particular sale was incompetent, did petitioners by their proof at the hearing before the Board of Tax Appeals overcome the presumption attendant upon the Commissioner's determination?

As the record discloses, no proof whatever concerning the issue was offered except the opinion of the witness Buck "that it was worth about $20.00 a share" in answer to the question, "Now, Mr. Buck, what, in your opinion, was the value of a share of common stock of [the buyer] on February 28, 1929?" The value of property received for purposes of computation of capital gain is the "fair market value." The opinion given by the witness was not his opinion of the "fair market value," but his opinion of "value." Stock may have a "par" value, a "book" value, and an "actual" value. All of them may differ from the "fair market" value, and among themselves. It is possible that we might infer in some cases that the "value" meant by the question was the "fair market value," but in this case we do not believe such an inference is justified because the witness disclaimed knowledge of actual sales. This testimony, taken together with the testimony that the witness had familiarized himself "with the stock structure of the company and the amount of stock outstanding," could easily lead to the inference that the witness was giving his opinion as to the "actual" value, rather than the "fair market" value.

Further in Dayton P. & L. Co. v. Public Utilities Commission, 292 U.S. 290, 299, 54 S.Ct. 647, 652, 78 L.Ed. 1267, it is said concerning estimates of "value" of gas leases: "If they have any proba-

tive effect, it is that of expressions of opinion by men familiar with the gas business and its opportunities for profit. But plainly opinions thus offered, even if entitled to some weight, have no such conclusive force that there is error of law in refusing to follow them. This is true of opinion evidence generally, whether addressed to a jury, Head v. Hargrave, 105 U.S. 45, 49, 26 L.Ed. 1028; or to a judge, The Conqueror, 166 U.S. 110, 131, 133, 17 S.Ct. 510, 41 L.Ed. 937; or to a statutory board, Uncasville Mfg. Co. v. Commissioner (C.C.A.) 55 F.(2d) 893, 897; Tracy v. Commissioner (C.C.A.) 53 F.(2d) 575, 577; Anchor Co., Inc., v. Commissioner (C.C.A.) 42 F.(2d) 99, 100; Gloyd v. Commissioner (C.C.A.) 63 F.(2d) 649, 650."

Thus, after the assumption above referred to is made, petitioners have not overcome the presumption attending the Commissioner's determination, and are therefore in no position to complain that the Board erred in changing the amount of the "fair market" value fixed by the Commissioner when the change was in favor of the petitioners.

Affirmed.