MAXE COLLEEN McCORKLE MORRIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morris v. Commissioner
Docket No. 1144-77.
United States Tax Court
T.C. Memo 1982-508; 1982 Tax Ct. Memo LEXIS 241; 44 T.C.M. (CCH) 1036; T.C.M. (RIA) 82508; September 8, 1982. *241 Held, fair market value of real property determined. Louis Salmon and Charles E. Richardson, III, for the petitioner. Thomas R. Thomas, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined that petitioner as a transferee of the Estate of James B. McCorkle, Deceased, is liable for a deficiency in its Federal estate *242 taxes in the amount of $376,535.25. Concessions having been made by petitioner, the sole issue remaining for our decision is the fair market value of two tracts of real estate, as of November 19, 1972, included in the gross estate. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioner, Maxe Colleen McCorkle Morris, resided in Brentwood, Tennessee, at the time of filing the petition herein. Petitioner is the daughter of James B. McCorkle. James B. McCorkle (hereinafter decedent) died testate on November 19, 1972. Decedent's estate was duly administered under the laws applicable to the administration of estates for the State of Missouri by its executor, J. B. Dillingham. The Probate Court of Clay County, on or about January 2, 1976, approved the final distribution of the probate estate of the decedent. By virtue of the final distribution, substantially all of the assets of decedent's estate, remaining after the payment of claims and administration expenses, were transferred without consideration to petitioner as beneficiary. On or about January 2, 1976, J. *243 B. Dillingham was discharged and released as executor by the Probate Court of Clay County. At the time of decedent's death, he and petitioner owned as joint tenants with the right of survivorship 488 acres (hereinafter the subject property or the 488 acres), located in Clay and Platte Counties, Missouri. As a result of decedent's death, his interest in the 488 acres passed to petitioner. The Estate of James B. McCorkle, acting by its duly authorized representative, timely filed a Federal estate tax return, on October 4, 1973, with the Internal Revenue Service Center, Kansas City, Missouri. In that return, the 488 acres were reported and included in the gross estate at a total fair market value of $332,151 (or $680 per acre). [1] Respondent determined in the statutory notice of liability mailed to petitioner on November 11, 1976, that the fair market value of the subject property was $1,122,000 (or $2,299 per acre) and, consequently, increased the taxable estate by $789,849. The subject property consists *244 of two land tracts, at the north city limits of Kansas City, Missouri. The larger tract is 347 acres. Of that amount, 228 acres are in Clay County and 119 acres are in Platte County. The Clay County portion is nearly rectangular and is approximately 1 mile in length, from north to south. This portion has a frontage on Highway 291 of approximately 2,100 feet on its north side. It also has frontages on Baugham Road on its west side and on 108th Street on its south side. Highway 291 is a 2-lane concrete road. Baugham Road, which is also the Clay-Platte County line, and 108th Street are 2-lane gravel roads. The Platte County portion adjoins the Clay County portion along its south one-half mile, with the two portions being separated by only Baugham Road. The Platte County portion is rectangular. It has frontages on Baugham Road on its east side and 108th Street on its south side. This entire tract is hereinafter referred to as the Home Place. The other tract is approximately 141 acres. It is about 1 mile to the northeast of the Home Place. On its west side, it has nearly 2,000 feet of frontage along a gravel road known as Main Street. This tract is hereinafter referred to *245 as the Main Street Property. The subject property as zoned R-A, or Agricultural Reserve, by the City of Kansas City, Missouri. Decedent utilized the property for agricultural purposes. At the time of decedent's death, the subject property was free from all mortgages, liens, and other encumbrances. On November 19, 1972, the subject property had electric and telephone service. It did not, however, have gas, water, and sewage services. The nearest waterline to the Home Place was located along the north side of Highway 291. No waterline was adjacent to the Main Street Property. Although there were no sewers within several miles of the subject property in November 1972, a sanitary sewer easement had been obtained near the east side of the Main Street property and plans called for a sewer to be available there in the foreseeable future (by late 1974). No plans existed for sewers to service the Home Place. The primary improvement on the subject property is the main house. This house is a 2-story house that contains 13 rooms, including 3 full bathrooms, 3 bedrooms, a breakfast room, a dining room, a living room, and a kitchen. It has a 2-car garage and an attached office *246 section. The original part of the house is more than 50 years old. It has, however, been fairly well maintained. Other improvements located on the subject property include two houses for tenants and several outbuildings, such as sheds, garages, and barns. The subject property is in a sparsely developed neighborhood. the nearest residential or commercial development of any significance, at the time of decedent's death, was a small, old community of modest homes known as Nashua, which is approximately 1/2 mile to the east of the Home Place. The New Mark Development is approximately 2 miles to the southeast of the subject property. It is a fully serviced and planned development, including one-family dwellings, apartments, and town houses, with homes selling for more than $50,000. The Kansas City International Airport (hereinafter the airport) is located approximately 5 miles west of, and 10 minutes by automobile from, the subject property. The central business district of Kansas City, Missouri, is located approximately 15 miles south of, and between 15 and 20 minutes by automobile from, the subject property. Approximately 1/2 mile to the east of the Home Place, there is an *247 expressway designated as U.S. 169, which proceeds straight southward to the downtown area of Kansas City, Missouri. At the time of decedent's death, Highway 291 was the primary road that went from east to west in the area of the subject property. Highway 291, after passing in front of the Clay County portion of the Home Place, continues in a northwesterly direction for a short distance and then proceeds due west to the main entrance of the airport. During late 1968 and early 1969, there were public hearings, which were well-publicized, regarding a proposal to extend Interstate 435 (hereinafter I-435). The proposal for the portion of the extension nearest to the subject property called for it to proceed straight west paralleling Highway 291, approximately 1/4 mile to the north of it. However, the proposed route would cross over Highway 291 at a point on the Clay-Platte County line, where Highway 291's course was northwesterly. I-435 would then continue westward and parallel to Highway 291 once again, toward the airport. A full cloverleaf interchange was planned at the junction of I-435 and U.S. 169. A diamond intercharnge was planned where I-435 crosses Highway 291. The final *248 plans for the extension of I-435 were endorsed on December 11, 1970, by the City Council of Kansas City, Missouri. The final plans are "practically identical" to the proposed plans. In the late 1960's and early 1970's, there were many purchases of real estate by investors or investor groups in the area of the subject property. Typical financing arrangements for these purchases consisted of downpayments of between 15 percent and 29 percent of the selling price, "with the sellers taking back * * * purchase money mortgage[s] with interest rates in the period of [1968] to 1972 of about six to seven percent." In 1968, on mortgages financed by lending institutions for such purchases, the prevailing interest rate was between 9 percent and 10 percent. However, if a purchaser intended to use the property as a farm and, therefore, could obtain a loan from the Federal Land Bank, the interest rate on such loan would be 7 1/2 percent or 7 3/4 percent. When considered with a view toward development, a salient feature of the subject property is the lay of the land. Although "[t]here are the usual creeks and water sheds through the property," the subject property "lays fairly well" *249 for the part of Missouri where it is situated. The land is attractive and creates few development problems. The highest and best use for the subject property is as agricultural land for between 8 and 15 years, with subsequent development primarily of a residential nature, including multi-family dwellings, and a limited amount of commercial development. Petitioner's first expert witness, William D. Davis, Jr., is a partner in a firm known as Appraisal Associates, located in Kansas City, Missouri. He has been engaged in the appraising profession for approximately 25 years. Mr. Davis has taught many courses in the field of appraising since receiving the MAI designation of the American Institute of Real Estate Appraisers approximately 16 years ago. He is currently serving on the Editorial Board of the professional publication of the Institute, which is entitled Appraisal Journal. Based on an appraisal that Mr. Davis made of the subject property, he determined that its fair market value as of the date of decedent's death was $670,000 (or $1,373 per acre). Petitioner's second expert witness, James L. Sawyers, has been engaged in the business of real estate appraising for *250 approximately 23 years. Mr. Sawyers was a member of Appraisal Associates for 9 years. He was then employed by the General Services Administration for 6 years, "first as Associate Regional Appraiser and later as a Realty Officer." Since July 1973, he has maintained his own real estate business located in Kansas City, Missouri. In 1966, Mr. Sawyers received his MAI designation from the American Institute of Real Estate Appraisers. He has served as an instructor for the Institute, by teaching Capitalization Theory and Techniques during 1975 and 1976 at Rockhurst College, Kansas City, Missouri. Mr. Sawyers appraised the subject property. He concluded that its fair market value as of November 19, 1972, was $646,600 (or $1,325 per acre). Respondent's appraiser and expert witness, Thomas Rule, has been engaged in the real estate appraisal business for approximately 21 years. His business is located in the Air World Center Office Building, which is next to the airport and is approximately 5 minutes by automobile from the subject property. Mr. Rule is on the Board of Directors of the Commerce Bank of Clay County, which is probably the closest bank to the subject property. For several *251 years, he has taught an appraisal course at Rockhurst College. Mr. Rule holds the MAI designation of the American Institute of Real Estate Appraisers. He is Chairman of the Institute's Comprehensive Examination Committee, which prepares and grades the final examination that is given to candidates for the MAI designation. The fair market value of the subject property arrived at (as of November 19, 1972) by Mr. Rule is $1,222,000 (or $2,299 per acre). ULTIMATE FINDING OF FACT As of November 19, 1972, the date of decedent's death, the fair market value of the subject property was $990,000. OPINION Section 2040[2] provides that, other than in certain circumstances not here relevant, the value of the decedent's gross estate includes "the value of all property * * * held as joint tenants by the decedent and any other person * * *." The subject property is, therefore, includable in decedent's gross estate at its fair market value at the time of his death. Section 2031; section 20.2031-1(b), Estate Tax Regs. The only issue for our decision is the fair market value of the subject property *252 as of November 19, 1972. Section 20.2031-1(b), Estate Tax Regs., provides that "fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." It further provides that the fair market value of any item "is not to be determined by a forced sales price." Respondent's determination of fair market value is deemed presumptively correct, and petitioner bears the burden of proving it arbitrary or erroneous. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Petitioner's position is that the fair market value of the subject property as of the date of decedent's death was $700 per acre or a total value of $341,600. Respondent's position, on the other hand, is that its fair market value was $1,122,000, or $2,299 per *253 acre. Both parties have submitted reports and testimony of appraisers who are sufficiently experienced and familiar with the Kansas City area so as to be qualified to render expert opinions as to the value of the subject property. The Appraisals
The valuation report prepared by Mr. Davis, petitioner's first expert witness, is dated December 22, 1975. Mr. Davis used, and gave consideration to the values indicated by, the cost, [3] income, and market data methods of appraisal to determine the value of the subject property. In using the cost approach, he estimated the value of the subject property's bare land by analyzing sales of vacant land in the area. In using the market data approach, he considered recent sales of properties that had some of the same features as the subject property. He adjusted the sales prices of the vacant land and the similar properties up or down to reflect differences between those tracts and the subject property. In his appraisal report, Mr. *254 Davis explains his reasons for making two types of adjustments to the actual sales prices of vacant land and similar properties in using both the cost approach and the market data approach. One of the adjustments is made for "the impact of a quick sale;" the other adjustment is made for "the impact of a potential interchange on Highway 291." [4]
Mr. Davis' explanation for the adjustments that he considers appropriate on account of a quick sale may be briefly summarized as follows. First, hr reasons that the marketing period for urban fringe property, such as the subject property, is, in general, approximately the same as the marketing period for industrial property, that is, from 2 to 3 years.He then postulates that it is customary to settle an estate with the payment of inheritance taxes within 1 year after the date of death or shortly thereafter. Therefore, he sets forth his "study" comparing sales occurring "quicker *255 than normal or * * * within one year of date of death versus two to three years - a normal holding and marketing period." The study compares sales by two estates (Mosby Estate to Hart Investors and Van Cleve Estate to Mos) [5] in the vicinity of the subject property to sales by certain other persons in the area. From this study, he concludes that the disadvantage attributable to a quick sale is nearly 15 percent. Mr. Davis determined adjustments for the impact of potential interchanges by analyzing several sales of properties in which the buyers could have expected the properties to be influenced by an interchange along I-435, when the construction of the highway is completed. He compares the prices at which those properties sold to the prices at which properties sold *256 that are not as near to an interchange, but are located along Highway 291. In three instances, his analysis indicates that he considered a certain portion of tracts of land as being affected by an interchange, and the remainder of the tracts as not being so affected. One piece of property (Shores to Colon) that he uses to show the positive impact of an I-435 interchange also has frontages on two major highways (Route W and Highway 291). Two pieces of property (Catholic Diocese to Closser and Downing to Curry) that Mr. Davis used in his analysis to indicate the lower prices at which properties not influenced by an interchange were selling are located several miles to the east of U.S. 169. [6] As a result of his analysis, Mr. Davis concludes that when a sale of property near an interchange is compared to a sale of property located on Highway 291, "a negative adjustment of approximately two-thirds" is indicated. *257 The appraisal report of Mr. Sawyers, petitioner's second expert witness, is dated April 13, 1978. Mr. Sawyers employed both the cost and market data methods of appraisal. [7] However, since, in his opinion, purchasers and sellers use a market data approach, but in a less sophisticated manner, he selected the value indicated by it as his "final value conclusion." Mr. Sawyers adjusted the sales price of comparable pieces of property for differences in such factors as size, time of sale (an increase of 3 percent *258 per year), and improvements from the subject property. In addition, he made adjustment for the following factors: (1) the lower price at which the subject property would be sold, in his view, if it were sold for cash, rather than on a contract or an installment method as the comparable properties were sold and (2) the lower price at which the subject property would have been sold, in his judgment, when compared to certain similar properties, on account of the absence of an interchange crossing the subject property. Mr. Sawyers derived the figures that he used to make an adjustment for the "difference between a contract and [a] cash sale" in virtually the same manner as Mr. Davis derived his adjustment for a quick sale. That is, he compared other sales in the area of the subject property to the sales, which were cash sales, made by the two estates in the vicinity. In contrast to Mr. Davis' report, the amount of the adjustments contained in Mr. Sawyers' report for the influence of interchanges is not explained, but is much more conclusory. Mr. Rule, respondent's expert witness, prepared an appraisal report dated February 19, 1975. Although he used a market data approach and a *259 summation (or cost) approach to arrive at the value of the subject property, he determined that the market data approach provided a better indication of its value than the summation approach. [8] To detemine the fair market value of the subject property under the market data approach, Mr. Rule principally relied on the following comparable sales: R6: Pennington to Peterson Enterprises -- 160 acres sold on November 30, 1972 for $280,000, or $1,750 per acre. R7: Downing to Curry Investment Co. -- 175.34 acres sold on February 12, 1971 for $262,500, or $1,497 per acre. R8: Munsell to Fotopoulos -- 255.91 acres sold on November 7, 1968 for $425,000, or $1,661 per acre. Mr. Rule made adjustments *260 to the total actual sales prices of these comparable properties, for such factors as differences in time (an increase of 15 percent per year), size, location, utilities, topography, and improvements. Since he determined that each of the sales was "a free market transaction with no undue pressure on either party and no unusual financing," he made no adjustments for the "circumstances" of the sales. The Valuation
Petitioner argues that Mr. Rule's appraisal is erroneous, as a matter of law, for two reasons: (1) he failed to adjust "speculative real estate transactions" on which he relied as comparable sales for the speculative market that existed in and around the subject property, relevant to the date of decedent's death and (2) he failed to convert the "liberal" sales terms of those comparable sales into actual cash values. Respondent contends that Mr. Rule properly relied upon the comparable sales chosen by him, which are arm's-length sales and represent the market as it existed, without making an adjustment on account of any speculation. We agree with respondent. It was held, a petitioner correctly points out, in Strong v. Rogers, an unreported case ( D. N.J. 1933, 14 AFTR 1207, 1224), *261 affd. 72 F.2d 455 (3rd Cir. 1934), cert. denied 293 U.S. 621 (1934), that market prices for stock in two insurance companies during the summer of 1929 were not conclusive of the fair market value of such stock, where "thousands of unskilled and unreasoning buyers and sellers" had entered the market during the years from 1927 to 1929, inclusive, solely for the purpose of speculation and there were not sufficient earnings behind the prices of the stock in question to warrant the market quotations. [9] In both Freshman v. Commissioner,33 B.T.A. 394 (1935), and Henritze v. Commissioner,28 B.T.A. 1173 (1933), however, the opposite result was reached. The evidence tended to show that the book value of intrinsic value of corporate stock, whose fair market value the Court was required to determine in those cases, was less than the market prices of the stock (in 1929), which in the opinion of one witness in Freshman was inflated by a "speculative public," and in Henritze by a public who seemed to feel "that the future was more important than either past experience or book value." Henritze v. Commissioner,supra at 1177. *262 Nevertheless, in both cases, the Court held that the average (or approximately the average) price at which the stock was selling on the New York Curb Exchange on the applicable valuation date was the fair market value of the stock. The approach taken in Freshman and in Henritze to a speculative market is the one to which we subscribe and that is supported by subsequent cases and the commentators. Amerada Hess Corp. v. Commissioner,517 F.2d 75, 84 (3rd Cir. 1975), revg. and remg. White Farm Equipment Co. v. Commissioner,61 T.C. 189 (1973); W.T. Grant Co. v. Duggan,18 F. Supp. 724, 726-727 (S.D.N.Y. 1937), affd. 94 F.2d 859, 861 (2nd Cir. 1938); Johnson v. Commissioner,74 T.C. 89, 96 (1980), affd. 673 F.2d 262 (9th Cir. 1982); II Bonbright, Valuation of Property, 1022-1023, 1076 (1st Ed. 1937).[10]
*263 Respondent agrees with petitioner's assertion that fair market value must be measured in terms of cash or terms equivalent to cash in the market. He contends, however, that since the comparable sales relied on by Mr. Rule were financed on terms that were typical in the market, the purchase prices of such properties do reflect their fair market value. [11]
*264 In Kaplan v. United States,279 F. Supp. 709 (Ariz. 1967), the taxpayers had received 40 acres of land as compensation. The sole issue presented for decision was the fair market value of that property as of the date of its receipt. The taxpayers' qualified expert appraiser determined that the property's fair market value at a cash sale on that date was $1,250 per acre. The government's qualified expert appraiser, on the other hand, considered comparable sales in the area of the property in question and determined that the property's fair market value upon terms typical in the area was $2,750 per acre. He testified, however, that his conclusion as to a cash sale would be a lesser amount than his conclusion as to a sale on terms, but did not state what the amount would be. The District Court noted that fair market value means, among other things, the cash price for which the property would have been bought at the time of acquisition considering its highest and most profitable use, if offered for sale on the open market in competition with like properties in the vicinity, given a reasonable time to find a purchaser. It held that the fair market value of the property *265 on the date of its acquisition was $1,350 per acre. Although the evidence herein is somewhat sketchy, it does indicate in the instant case that the sales prices on terms of comparable properties were not the equivalent of cash in the market. As noted in our findings of fact, during the years preceding decedent's death, in the vicinity of the subject property many real estate sales were made to investors, with the sellers receiving downpayments of between 15 percent and 29 percent of the sales price and a purchase money mortgage for the balance. The interest rate charged by the sellers on the balance was between 6 percent and 7 percent. In contrast, the record indicates that during at least one of those years (1968), the prevailing interest rate on mortgages financed by lending institutions on such sales was between 9 percent and 10 percent. Upon cross-examination, Mr. Rule agreed that the comparable sales used in his appraisal report, which were installment sales, would have been for less money if they had been for cash. Accordingly, based upon the evidence in this case, in determining the fair market value of the subject property as reflected in our findings of fact, we have *266 made an adjustment to convert the prices of the comparable financed sales to cash value. [12]
Mr. Davis' adjustments for the impact of a quick sale are contrary to section 20.2031-1(b), Estate Tax Regs. By making such adjustments, he is, in essence, assuming sales attributable to economic necessities, in the form of estate taxes, facing the sellers. The fair market value that he derives for the subject property, therefore, is not the price at which the property would be sold by a willing seller, who is under no compulsion to sell. Thus, the adjustments for the effect of a quick sale are improper. As previously noted, the adjustments made by Mr. Sawyers to convert the prices of financed sales to cash sales prices were derived by him in almost the identical way that Mr. Davis' adjustments for a quick sale were determined. Considering that Mr. Sawyers' appraisal report was prepared more than 2 years *267 after Mr. Davis' report was completed, we find that, as respondent suggests, the adjustments made by Mr. Sawyers are quite simply Mr. Davis' quick sale adjustments masquerading as cash equivalency adjustments. We agree with the conclusion of petitioner's experts that the value of land located directly on the proposed interchanges of I-435 was enhanced as a result of the expectation that commercial development would occur near the interchanges. Nevertheless, the evidence before us does not support negative adjustments in amounts as great as the adjustments made by them for the influence of the interchanges. Mr. Davis' theoretical division of single tracts into portions affected by the interchanges and portions not so affected appears to be the product of guesswork. His use of properties several miles to the east of U.S. 169 to show the lower values for which properties other than those situated at the proposed interchanges were sold causes us to further question the accuracy of his results. Moreover, although the subject property will not be able to be seen well from I-435, we note that in Mr. Davis' appraisal report (at page 19), he states that both the full cloverleaf interchange *268 at proposed I-435 and U.S. 169 and the diamond interchange at Highway 291 and proposed I-435 will "provide good access" to the Home Place. Thus, when the subject property is considered in terms of its proximity to I-435, it is very well located. In using sales prices of comparable properties sold at a time other than the date of decedent's death, as previously indicated, Mr. Rule made upward adjustments of 15 percent per year to account for changes in the value of the properties sold in the time between the sales dates and decedent's death; Mr. Davis did likewise. On the other hand, Mr. Sawyers made adjustments for time of 3 percent per year. We think that a 15-percent adjustment, rather than a 3-percent adjustment, is appropriate. The paired sales (the sales prices of properties sold at two different times) presented in Mr. Rule's report clearly indicate that land in the vicinity of the subject property was continuously increasing in value, at an average rate in excess of 15 percent per year. Whether the increases were attributable to either the development of the airport or a trend of development northward along U.S. 169 is completely irrelevant since, whatever the cause, *269 as established by the appraisal reports of Mr. Rule and Mr. Davis, [13] the fact remains that the value of land in the area was increasing at approximately 15 percent per year. On cross-examination, Mr. Rule agreed that, since the Main Street Property has no frontage except on a city street, whereas the Home Place has frontage on Highway 291, the Main Street Property is slightly less valuable than the Home Place. However, Mr. Rule appraised both the tracts as a unit. In his report, when explaining adjustments that he made for differences between the locations of comparable properties and the location of the subject *270 property, Mr. Rule refers to the subject property as being located on Highway 291. We, therefore, agree with petitioner's assertion that, in appraising the Main Street Property and the Home Place as a unit, Mr. Rule inflated the value of the Main Street Property, by giving insufficient consideration to its locational disadvantages. Petitioner's argument that from the perspective of November 1972 the highest and best use of the subject property was as vacant agricultural land for the foreseeable future (through the year 2000) is not supported by the evidence. One of petitioner's own experts, Mr. Davis, had concluded that, as of November 1972, the highest and best use of the subject property was to hold it as agricultural land for 10 to 15 years, when he predicted sufficient demand to justify commercial and residential development would occur. [14] The large number of sales to investors in the area also evinces an optimism that development would soon take place. Whether this optimism was caused by a trend of development that was proceeding northward from Kansas City along U.S. 169 or an expectation of development beginning at the proposed I-435 interchanges, the location of the *271 subject property suggests it would benefit. Development of the Home Place for residential purposes would require, as petitioner suggests, the expenditure of funds to provide a treatment plant for sewage and to gain access to the waterline installed across Highway 291 from the Home Place. Likewise, development of the Main Street Property for residential purposes would entail equipping it with adequate water service. In this respect, the subject property is less valuable than land in the area to the south and to the east of it, which is fully serviced by utilities. However, none of *272 the comparable properties used by Mr. Rule is located in the area to the south and to the east of the subject property, where all utilities are available. Moreover, Mr. Rule's report indicates that he made appropriate adjustments when the utilities available to the subject property were different from the utilities available to a comparable property. The fair market value of a piece of property is to be resolved by considering and weighing all relevant evidence in the record. Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Having examined all of the evidence before us, we conclude that the subject property had a fair market value as of November 19, 1972, of $990,000. Decision will be entered under Rule 155.
Footnotes
1. The parties have stipulated that the entire 488 acres were returned at $332,151 although the estate tax return shows that 484.14 acres were returned at $332,151.↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year at issue.↩
3. As used in Mr. Davis' report, the cost method requires the appraiser to add "the value of the land bare and subject to improvement" to "the depreciated reproduction cost new of the improvements."↩
4. In addition to the adjustments for the impact of a quick sale and the impact of potential interchanges, Mr. Davis made adjustments for differences in such factors as the lay of the land, the time of sale (an increase of 15 percent per year), and improvements.↩
5. Mr. Davis' report states that the sales by those estates were "necessary." Specifically, it indicates that the sale by the Mosby Estate "was necessary due to provisions Mr. Mosby made for a son by a former wife" and that, a quick sale by the Van Cleve Estate was necessary, since "Mr. and Mrs. Van Cleve died [within] a short time of each other, and the property ended up in the hands of a daughter-in-law."↩
6. It is Mr. Rule's theory that, as of the date of decedent's death, the trend of development from Kansas City northward was along a corridor on both sides of U.S. 169. In his appraisal, he selected a tract several miles to the east of U.S. 169 and to the south of Highway 291 as setting the least amount paid for property in the area of the subject property.↩
7. At the request of petitioner's attorney, Mr. Sawyers also furnished the estimated value of the subject property as a farm, in accordance with his understanding of the method of valuation available to estates of decedents who died after December 31, 1976. See section 2032A. Petitioner does not contend that the method of valuation provided by section 2032A is available in the instant case. In any event, we note that it is not available to petitioner, since decedent died prior to January 1, 1977, and section 2032A applies to the estates of decedents dying after 1976. Pub. L. 94-455, 90 Stat. 1856. See Hankins v. Commissioner,T.C. Memo. 1981-326↩.
8. Since, in Mr. Rule's opinion, a purchaser buying the subject property for development in a short while usually would not place much weight on the income derived from using the property for agriculture, he concluded that the income approach was not applicable. He rejected the value reflected by the summation approach, because that approach requires that the appraiser "estimate the amount of depreciation that has occurred to rather extensive improvements," which is difficult to do.↩
9. See also Urciolo v. Sachs,62 A.2d 308 (D.C. 1948) and Abrams v. Sinn,193 Iowa 528, 187 N.W. 491↩ (1922), which petitioner cites, (actions for damages for breaches of contracts to convey real property, in which speculative value of property was deemed to not represent its fair market value). 10. In petitioner's brief, she contends that several other cases in addition to those previously mentioned are pertinent to the facts in this case and stand for the proposition that speculative sales do not indicate fair market value. Those cases are as follows: Kerr v. South Park Commissioners,117 U.S. 379 (1886); Pendleton v. Commissioner,20 B.T.A. 618 (1930); Couzens v. Commissioner,11 B.T.A. 1040 (1928); Harwell v. Commissioner, a Memorandum Opinion of this Court dated May 15, 1947; Cathcart v. Schwaner, an unreported case ( S.D. Ill. 1929, 15 AFTR 564); Phillips v. United States,12 F.2d 598 (W.D. Penn. 1926), revd. on other issues 24 F.2d 195 (3rd Cir. 1928); Somers v. City of Meriden,119 Conn. 5, 174 A. 184 (1934).None of those cases support petitioner's position. After examining the prices at which real property was sold both before and after the date of decedent's death in the vicinity of the subject property, we find that petitioner, unlike the taxpayer in Cathcart v. Schwaner,supra, has failed to establish that the subject property had a substantial speculative value that it lost on account of a summary deflation immediately preceding the date of decedent's death. In Couzens,Pendleton, and Somers v. City of Meriden, the Courts clearly did not hold that speculative sales do not reflect fair market value. In each of those cases there was no general market for the type of property whose fair market value the Courts were required to determine. The Court in Phillips v. United States,supra,↩ determined that as of March 1, 1913, the fair market value of the taxpayer's corporate stock was greater than the the bid price of the stock and the average selling price on the stock exchange.However, its determination was based on evidence adduced by the taxpayer indicating, in essence, that a premium would have been paid for his stock since it represented a part of the controlling interest in the corporation.
11. In support of his position, respondent relies on only the following paragraph of a real estate appraisal text: Terms of Sale It was once the practice to reject sales that did not represent a cash transaction. It was believed that real estate purchased with a relatively low down payment was not a "true" indication of market value. Today most appraisers would judge a sale according to whether the sale was financed under typical mortgage terms. [Shenkel, Modern Real Estate Appraisal, p. 136 (1978).] The paragraph following the one quoted above indicates that when the author used the phrase "typical mortgage terms," he had in mind the terms of a loan, secured by a mortgage, that had been received from a financial institution, such as a savings and loan association, a bank, or a life insurance company. We, therefore, do not think that the text provides any authority for judging sales according to whether they were financed on terms typically set in the market by individual sellers, as the comparable sales in Mr. Rule's report were financed.↩
12. As noted infra,↩ at p. 21, however, we agree with respondent that Mr. Sawyers' adjustment to convert contract sales to cash sales is Mr. Davis' quick sale adjustment in disguise. We, therefore, have determined the adjustment used by us without regard to his adjustment.
13. Mr. Sawyers, who prepared his report nearly 5-1/2 years after decedent's death, reasons that since in the area of the subject property sales had decreased by 1974 and "little or no development" had occurred by 1978, no adjustment should be made for time. Later in his report, however, he makes, without explanation, an upward adjustment of 3 percent per year for time. Considering Mr. Sawyers' use of hindsight in initially deciding to make no adjustment and his failure to explain the adjustment that he ultimately makes, we place no weight on his adjustment.↩
14. In her brief, petitioner relies upon the appraisals of two "court-appointed appraisers" who appraised the subject property as agricultural land. Appraisal letters from those appraisers are attached to the estate tax return, which was submitted into evidence. However, those appraisers did not testify and no appraisal reports prepared by them are before the Court. The appraisal letters attached to the return are insufficient to satisfy petitioner's burden of proof. Rocco v. Commissioner,T.C. Memo. 1973-118; Pridmore v. Commissioner,T.C. Memo. 1961-12↩.